<u>NOT FOR PUBLICATION</u>

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>OMAR JACKSON,<br><br>    *Defendant*. | Crim. No.: 19-886 (KSH)<br><br><br><u>**OPINION**</u> |

### I.   Introduction

Defendant Omar Jackson, who brings this motion to suppress (D.E. 19, 64), and a Newark police detective, Steven Resendes, gave testimony at an evidentiary hearing about their encounter in the stairwell of 207 Pennington Street, Newark, one of four buildings that make up the Pennington Street public housing complex located in Newark's central ward. Scant minutes elapsed between their first sight of each other and Jackson's arrest for illegal gun possession by the Newark police, albeit the participants' recital of the events at the hearing took hours. For the reasons below, the Court concludes that the stop and seizure of Jackson and subsequent search of the bag he was carrying that yielded the gun was an unconstitutional intrusion, unjustified by the evidence adduced at the hearing, and Jackson's motion is granted.

### II.   Background

#### A. Facts

The facts as elicited during the evidentiary hearing are as follows.

Around 11:40 a.m. on November 5, 2019, Newark police detectives Steven Resendes and Rodney Severe and Lieutenant Anthony Venancio were dispatched to the Pennington Street public housing complex (the "complex" or "Pennington complex") to find and arrest an

1

individual referred to during the evidentiary hearing as "Nate Love," who was wanted for aggravated assault. (D.E. 40, 4/20/21 Tr. at 8:6-9:4; 12:17-18.) The officers had a description of Love as 5'8" tall and 160 pounds, and knew that he frequently "h[ung] out" at the Pennington complex. (*Id.* at 38:12-20; 40:3-41:3.)

The four-building complex borders four streets—Pennington Street, Pacific Street, South Street, and Dawson Street—with an entrance located on each street. (*Id.* at 11:18-23; 87:21-24.) A courtyard, which can be accessed from each entrance, sits in the center of the complex. (*Id.* at 88:4-5.)

On the morning in question, the officers planned their entrance into the Pennington complex, mindful from past experiences there that suspects can flee through the courtyard using the Pennington or Pacific Street entrances. (*Id.* at 12:19-13:5.) Resendes and Severe would enter the complex on Pennington Street, and Venancio would wait in his car on Pacific Street. (*Id.* at 12:22-25; 39:13-15.)

Resendes and Severe drove to the complex, parked, and entered the courtyard through Pennington Street. (*Id.* at 13:16-20.) They observed a man dressed in all gray leaning against the Pacific Street side of the building, who spotted them, turned around, and waved somebody else away, which Resendes construed as a "look out" warning connected with narcotics transactions. (*Id.* at 13:22-14:9.) A few moments later, Venancio radioed Resendes and Severe to report that a male had exited 207 Pennington Street and then had immediately run back inside. (*Id.* at 14:11-13, 22-23.)[1]

---

[1] The government posited in its first opposition brief on the suppression motion that Jackson was the individual who "turned and ran back into 207 Pennington Street." (D.E. 22 at 1.) This representation was completely abandoned when the government presented its evidence at the hearing.

2

The officers convened and decided to enter 207 Pennington Street.  (*Id.* at 16:20-22.)  Once inside, they saw a stairwell that leads to a first-floor landing, followed by two staircases in an L-like formation to a second-floor landing, and another two staircases to a third-floor landing.  (*Id.* at 24:21-25; *see* Def. Exs. 2, 2A, 3, 5.)  In Resendes' estimation, each landing is approximately 8 to 10 feet long by 8 to 10 feet wide and can fit approximately three people at a time, whereas the stairwells can only fit one.  (4/20/21 Tr. at 41:13-22.)[2]

The officers climbed the first stairwell and encountered an unknown man, later determined to be a "Mr. Logan," standing in the hallway.  (*Id.* at 19:4-5.)  He was approximately 6'10" tall.  (*Id.* at 19:9-10.)  Although the officers knew that Logan was not Nate Love, they questioned him about whether he lived in the building and whether he knew Love.  (*Id.* at 19:12-16; 23:1-8; 41:7-8.)  Logan answered each question in the negative.  (*Id.* at 19:7-8; 23:4-8.)

Assured from Logan's demeanor that he was not a threat to their safety, Severe remained with him while Resendes and Venancio canvassed the building's hallways.  (*Id.* at 24:2-11; 26:10-13.)  Satisfied that no one else was present, they returned to the first floor.  (*Id.* at 26:14-16.)  As the officers waited for Logan's record check to clear,[3] they heard an upstairs door open and close, followed by footsteps coming down the stairs.  (*Id.* at 26:16-22.)  Unsure whether that person could be Love, the officers silently waited.  (*Id.* at 26:23-27:3.)

As the footsteps grew closer, Omar Jackson, wearing a black jacket and carrying a white Dr. Jay's bag in his right hand, turned the corner and came into view.  (*Id.* at 27:7-8; 28:4-7.)  He

---

[2] Resendes responded "Yes" when defense counsel posited that the hallway was "very tight." (*Id.* at 59:20-22.)

[3] The officers appear to have performed a record check because they smelled burnt marijuana when they entered the first-floor hallway. (*See id.* at 49:6-7.)

3

stopped at the landing between the first and second floors. (*Id.* at 27:7-9.) Resendes testified that he knew immediately that Jackson in no way resembled Love. (*Id.* at 58:12-21.)[4]

Jackson testified that he was confused when he saw the officers, badged but in plain clothes, standing next to Logan on the first-floor landing; Resendes, on the other hand, described Jackson as "startled." (*Id.* at 8:11-14; 28:12-18; 97:24-98:1.)[5] The officers asked Jackson whether he knew Love, whether he (Jackson) lived in the building, and what apartment he had just left. (*Id.* at 29:2-13; 98:21-22.) He responded that he did not know Love and was in the building to pick up clothes for his sister, but he could not recall which apartment he came from. (*Id.* at 29:2-15; 97:14-16; 98:23.) Resendes testified that Jackson paused between questions and stuttered when he spoke, all the while shifting the Dr. Jay's bag from one hand to another. (*Id.* at 29:14-23.)

Jackson started walking down the stairs toward the officers. (*Id.* at 30:17-18; 67:21-24; 98:6-7.) Resendes asked what was in the bag. (*Id.* at 30:13.) Resendes testified that Jackson

---

[4] The transcript contains several references to the physical differences between Love and Jackson. For example, Love is described as "a slender gentleman" (*id.* at 40:24-25) and Jackson is described as "a fairly large individual" (*id.* at 57:17-18). On cross-examination, Resendes testified as follows:

> Q: . . . And [Jackson] is stopped by Lieutenant Venancio?
>
> A: He is stopped on top of the stairwell.
>
> . . .
>
> Q: Okay. **And it is immediately apparent that Mr. Jackson in no way resembled Mr. Love. Correct?**
>
> A: **Yes.**

(*Id.* at 58:3-14 (emphasis added).)

[5] Specifically, Jackson testified: "I wasn't nervous, but I was, like, what is going on?" (*Id.* at 97:25-98:1.)

4

was free to leave and could have walked past him, Logan, and the other officers and continued walking on out of the building. (*Id.* at 59:23-60:2.) Jackson testified that one of the officers blocked his way by putting his left arm up, "shov[ing]" him as he tried to walk past. (*Id.* at 98:6-13.)

The testimony agrees that Jackson told Resendes, in response to his question about the contents of the bag, that there were clothes in it. (*Id.* at 31:1-3; 99:3-4.) According to Resendes, Jackson voluntarily reached into the bag and took out a red scarf. (*Id.* at 31:3-5.) Now less than an arm's length away, Jackson let go of one of the bag's loops and as the bag tilted open, Resendes shone his flashlight into the bag and saw the butt of a gun wrapped around a black sweater. (*Id.* at 31:5-14, 20-22; 32:5-7; 85:8-12.) Resendes took the bag away from Jackson, and the other officers placed him under arrest. (*Id.* at 32:9-12.)

According to Jackson, Resendes said "What's in the bag?" and at his direction, Jackson opened it. (*Id.* at 99:6-8.) Resendes searched it. (*Id.* at 99:9.) He pulled out a scarf and found the gun. (*Id.* at 99:9-11.) Jackson testified that the officers proceeded to "bum-rush" him and place him under arrest. (*Id.* at 99:12-16.)

According to Resendes and undisputed, only one to two minutes had transpired from the time the officers saw Jackson at the top of the landing until his arrest in the stairwell. (*Id.* at 32:24-33:3.)

### B. Procedural History

A month later, on December 4, 2019, Jackson was charged in a one-count federal indictment with unlawful possession of a firearm by a felon in violation of 18 U.S.C. § 922(g). (D.E. 1.) On December 8, 2020, Jackson moved to suppress the gun as the fruit of an unconstitutional search and seizure and requested an evidentiary hearing. (D.E. 19.) In

opposition, the government argued that the search and seizure of Jackson were constitutional and that an evidentiary hearing was unnecessary because Jackson failed to "put any material facts in dispute." (D.E. 22.) At the hearing, which was held in person on April 20, 2021, the Court heard the conflicting testimony from Resendes and Jackson set forth above, and ordered post-hearing briefing. (D.E. 39-41.)

As the Court was finalizing its opinion, the defense filed a supplemental submission drawing the Court's attention to two recent decisions in this district bearing on the issues in dispute. (D.E. 64.)[6] The government responded to that submission on October 20, 2022. (D.E. 66.) Accordingly, the Court's opinion considers the testimony and exhibits admitted during the April 20, 2021 evidentiary hearing, as well as the subsequent rounds of briefing. (*See* D.E. 40, 42, 43, 64, 66.) Relative to the scope of what the relevant evidence is, the Court reaffirmed its ruling that it would not consider proffered evidence from the government about Jackson's post-arrest contacts with others. (*See* D.E. 65.)

### III. Discussion

Jackson asks the Court to suppress the handgun as the fruit of a pretextual stop, seizure, and subsequent search. (D.E. 42, Def. Br.) The government's opposition justifies the stop and recovery of the gun as appropriate under *Terry v. Ohio,* 392 U.S. 1 (1968), arguing that the officers had reasonable suspicion to stop Jackson and then seize the gun that was in plain view among the contents in the bag he was carrying. (D.E. 43, Gov. Br.)

The Fourth Amendment protects the public against "unreasonable searches and seizures." U.S. Const. amend. IV. For a seizure to be considered "reasonable," it generally "must be

---

[6] *United States v. Nelson*, 2022 WL 4774417 (D.N.J. Oct. 3, 2022) (Wigenton, J.); *United States v. Price*, 2021 WL 6062341 (D.N.J. Dec. 22, 2021) (Wigenton, J.).

effectuated with a warrant based on probable cause." *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002). However, there are certain well-delineated exceptions to the warrant requirement, one of which allows law enforcement officers to conduct a brief investigatory stop, or a *Terry* stop, upon a showing of less than probable cause—namely, if he or she "has a reasonable, articulable suspicion that criminal activity is afoot." *United States v. Lewis*, 672 F.3d 232, 237 (3d Cir. 2012) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)).

**A. When Was Jackson Seized?**

In analyzing the lawfulness of a *Terry* stop, the Court "must first pinpoint the moment of the seizure." *United States v. Lowe*, 791 F.3d 424, 430 (3d Cir. 2015). A suspect is "seized" under the Fourth Amendment when there is either "a laying on of hands or application of physical force to restrain movement," or a "submission to a 'show of authority.'" *United States v. Brown*, 448 F.3d 239, 245 (3d Cir. 2006) (quoting *California v. Hodari D.*, 499 U.S. 621, 626 (1991)). When the suspect is deemed to have been seized by a "show of authority," the Court must be satisfied that "the officer's words and actions would have conveyed . . . to a reasonable person' that he was not free to leave." *Lowe*, 791 F.3d at 430 (quoting *Hodari D.*, 499 U.S. at 628). "Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

Here, Jackson contends that he was seized when Resendes refused to step aside and allow him to leave the stairwell which differs from what the government appears to argue, which is that Jackson was not seized until Resendes observed the gun in his Dr. Jay's bag. (*Compare* Def. Br.

7

at 2 *with* Gov. Br. at 7, n.3.)  Both men gave conflicting accounts about what happened during the short time involved.  The Court finds that Jackson's account is more credible.

Resendes testified on direct examination that Jackson was "free to leave." (4/20/21 Tr. at 60:2.)  In context, this doesn't make sense.  The photographs introduced at the evidentiary hearing without objection (*see* Def. Exs. 2, 2A, 3, 5) show that the stairwell in question was narrow—so narrow that Resendes himself testified it could accommodate only "one person at a time." (4/20/21 Tr. 41:15-16.)  Moreover, all three officers and 6'10" Logan, apparently detained by the police, were grouped on the landing at the bottom of the stairs, a space that in Resendes' estimation could fit three people.  (*Id.* at 41:17-18; 57:10-12.)  It defies logic that a reasonable person would think he had a clear path to leave.  Resendes admitted as much on cross examination:

> Q: He was stopped on that landing and he couldn't go anywhere?
>
> A: No.
>
> Q: He wasn't?
>
> A: He wasn't stopped on the landing.  He stopped himself on the landing.
>
> Q: Because an officer started to ask him questions.  Correct?
>
> A: After he had, after he had stopped.
>
> Q: **Well, he stopped because there is four gentlemen standing on a small landing that he can't get through.  Correct?**
>
> A: **Yes.**

(*Id.* 63:1-12 (emphasis added).)

Tight conditions aside, Resendes testified that he and the officers started asking Jackson questions right away about who he was and what he was doing in the building, all consistent with measures that are part of an investigative stop.  One of the first reasons Resendes gave at the

8

hearing to justify the questioning was that Jackson appeared "startled" when he saw the knot of people at the foot of the stairs.  (*Id.* at 28:12-15.)  As a natural consequence to that "startled" look, it follows that Resendes would seek to make Jackson halt and remain subject to further investigation up to and including barring Jackson from descending the stairs, which is what Jackson testified he did.  (*See id.* at 98:6-15.)  Further, the police were asking questions and expecting answers, undermining any suggestion that Jackson was free to ignore them and walk on by.  Under those circumstances, no reasonable person in Jackson's position would believe he was free to leave.  The facts demonstrate convincingly that Jackson was stopped and seized before Resendes looked into the bag rather than after the gun was revealed.

### B. Was the Seizure Justified by Reasonable Suspicion?

The lawfulness of that seizure requires a two-part test.  First, the Court must "examine 'whether the officer's action was justified at its inception' – that is, whether the stop was supported by reasonable suspicion at the outset."  *United States v. Johnson*, 592 F.3d 442, 452 (3d Cir. 2010) (quoting *Terry,* 392 U.S. at 20).  Second, the Court must "determine whether the manner in which the stop was conducted 'was reasonably related in scope to the circumstances which justified the interference in the first place.'"  *Id.* (quoting *Terry,* 392 U.S. at 20).  To qualify as "reasonable suspicion," a law enforcement officer "needs only 'a minimal level of objective justification.'"  *United States v. Foster*, 891 F.3d 93, 104 (3d Cir. 2018) (quoting *Wardlow*, 528 U.S. at 123).  "The test is one of reasonableness given the totality of the circumstances, which can include [the suspect's] location, a history of crime in the area, [the suspect's] nervous behavior and evasiveness, and [the officer's] 'commonsense judgments and inferences about human behavior.'"  *Johnson v. Campbell*, 332 F.3d 199, 206 (3d Cir. 2003) (quoting *Wardlow*, 528 U.S. at 124-25); *see United States v. Fogle*, 515 F. Supp. 2d 474, 483 (D.N.J. 2007) (Cooper, J.) (noting that a "reasonable suspicion may be the result of any

9

combination of one or several factors," including "specialized knowledge and investigative inferences" and "personal observation of suspicious behavior") (internal citations omitted). An officer's determination of reasonable suspicion is to be afforded "considerable deference." *United States v. Mosley*, 454 F.3d 249, 252 (3d Cir. 2006).

Here, the officers were present at the Pennington complex for one specified reason—to find and arrest Nate Love. Resendes testified that he knew that Jackson was not Love the minute he saw him rounding the stairwell, and despite this, the police officers began to question him and halt his progress. Aware that the police focus shifted and the implications of that, the government cites to *Rodriguez v. United States*, 575 U.S. 348 (2015) and argues that the Court must determine when the "*Rodriguez* moment" occurred. (*See* Gov. Br. at 13-15.)

In *Rodriguez,* the Supreme Court established a test for analyzing the lawfulness of an extension of a *Terry* stop. The Court held that "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop . . . and attend to related safety concerns." *Id.* at 354. "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.*

The Third Circuit recently addressed the "*Rodriguez* moment" in *United States v. Hurtt*, 31 F.4th 152 (3d Cir. 2022). There, two officers, Gonzalez and Cannon, stopped a pickup truck after it rolled through a stop sign and failed to signal a turn. As they approached the truck, they found three passengers inside—the driver, a front-seat passenger who was heavily intoxicated, and Hurtt, who was in the back seat. The officers asked the driver to step out of the truck for a sobriety test. The driver complied, leaving his door open as he left the truck.

While Gonzalez conducted the test behind the tailgate of the truck, Cannon climbed into the truck through the open driver-side door to address Hurtt and the front-seat passenger. Once inside the truck, Cannon noticed that there were tools strewn around the interior and that the front-seat passenger was trying to divert his attention away from Hurtt. Concerned that the passengers were not complying with three separate orders to keep their hands visible, Cannon realized he needed to get them out of the truck.

Gonzalez was about a minute into administering the sobriety test when he realized that Cannon had entered the truck. Concerned for Cannon's safety, Gonzalez stopped what he was doing, secured the driver inside the patrol car, and approached the truck. By then, Cannon had already begun to remove the front-seat passenger. Hurtt (who was still in the rear seat) turned his back to Cannon and reached for a tool bucket on the seat next to him. Cannon immediately ordered Hurtt to show his hands and though he initially complied, Hurtt then reached for the tool bucket a second time. Cannon caught Hurtt's arm and ordered him out of the truck. A search of Hurtt's person revealed a loaded handgun inside his waistband.

Hurtt moved to suppress the handgun as the fruit of an unreasonable extended stop, arguing that he was searched *after* the tasks tied to the traffic stop reasonably should have been concluded. The district court denied his motion. On appeal, the Third Circuit reversed. Reasoning that "the mission of the traffic stop [must be] continuously carried out before the discovery of evidence giving rise to a reasonable suspicion of criminality," as "[a]ny break in that mission taints the stop because it is the result of an unreasonable delay," the court found that the initial "mission" of the stop was the DUI investigation of the driver. *Id.* at 159, 161. That mission reasonably should have been concluded by the time the officers searched Hurtt but it was not, because Gonzalez "felt compelled to pause the DUI inquiry to ensure Cannon's safety."

11

*Id.* at 163.  Because "this off-mission conduct was without reasonable suspicion and extended the traffic stop, it was unlawful under *Rodriguez*."  *Id.*

Before applying what *Hurtt* teaches about the "*Rodriguez* moment," the Court notes that it is immaterial that a traffic stop was involved there, and in citing to *Rodriguez* the government agrees.  Packed into a narrow hallway in a residential building or giving orders to the occupants of a car they stopped, law enforcement was interacting with citizens in both cases.  What is relevant is the extension of police investigation and involvement beyond "the mission" that put them into contact.  As the Third Circuit noted, *Rodriguez* held that "unrelated inquiries" resulting in even a *de minimis* extension of a traffic stop are unlawful if not supported by reasonable suspicion.  *Hurtt*, 31 F.4th at 160.  And so the government has gathered cases discussing the *Rodriguez* moment and the "art" of determining it (Gov. Br. at 13-14), and argues it happened in this case "when Det. Resendes asked Jackson what was in his bag"—

> By that point, Det. Resendes possessed all the specific and articulable facts . . . to suspect Jackson of possessing contraband in the bag.  The officer's conduct up to that moment was lawful and on-mission.

(*Id.* at 14.)

The Court disagrees.  To begin with, a strong argument can be made that what was going on when the officers turned their focus on Jackson was a redirection and not an extension of their investigative activity.  Jackson was not Love and they knew it.  He said, as had Logan, that he didn't know Love.

*Rodriguez,* as interpreted by *Hurtt,* requires the Court to find that an officer has reasonable suspicion to investigate "off mission."   Decidedly, the police were off mission when they turned their focus on Jackson and extended their inquiry into his actions and not the whereabouts of Nate Love.  The Court concludes that the earliest *Rodriguez* moment happened

12

when the questioning continued beyond Jackson's answer about not knowing Nate Love, and so the Court asks: What reasonable suspicion that criminal activity was afoot did the police have to justify their continuing to question, and ultimately halt, Jackson and demand he account for the contents of his bag as opposed to moving aside and permitting him to exit the building?

What the officers knew, according to the record, when they encountered Jackson was that he was not Nate Love, that he was descending from one of the upper floors (where they had already searched for Love), and that per Resendes' testimony, he looked "startled." (4/20/21 Tr. at 28:12-15.) The facts show that as Jackson rounded the stairs he encountered three police officers, badged but in plain clothes, silently looking up at him from the first-floor landing, with another individual apparently already in their custody. Arguably anyone under those circumstances would be confused, or even startled. Crediting Resendes' description that Jackson looked startled as opposed to confused, the only other indicia of criminality Resendes testified to was Jackson's shifting the Dr. Jay's bag from hand to hand. The Court has already found that when Jackson's way was halted by continued questioning, the police were making a show of authority, and when one of the officers stopped his progress by extending his arm in the narrow stairwell, Jackson was stopped and seized. Whether seen through the lens of *Terry* or scrutinized under a "*Rodriguez* moment" test, the police needed reasonable suspicion to make and continue their investigatory stop, and they had only nervous demeanor and hand movements as justification.

The case law is clear that this is not enough. *See United States v. Alvin*, 701 F. App'x 151, 155 (3d Cir. 2017) (finding that defendant's nervousness was insufficient to justify stop, reasoning that it is "'certainly not uncommon for most citizens—whether innocent or guilty—to exhibit signs of nervousness when confronted by a law enforcement officer'"); *see also Price*,

13

2021 WL 6062341, at *6 ("Defendant's hand movements near his waist band while in a high crime area does not alone constitute a reasonable articulable suspicion."); *accord United States v. Sears*, 2019 WL 6715603, at *4 (D.N.J. Dec. 10, 2019) (Martini, J.), *aff'd,* 835 F. App'x 671 (3d Cir. 2020) ("[M]aking an adjusting or lifting motion towards his waistband . . . is too innocuous and frequent an occurrence, without indication of something more . . to suggest that criminal activity is afoot.").

While reasonable suspicion is an "elusive concept," *United States v. Cortez*, 449 U.S. 411, 417 (1981), it "requires that the officer articulate something more than an inchoate and unparticularized suspicion or hunch," *Madsen v. Washington Twp. Police*, 2021 WL 3932056, at *4 (D.N.J. Sept. 2, 2021) (Wolfson, J.) (internal citations and quotations omitted). Resendes said it best about what the police knew when he testified that something seemed "out of whack" when he encountered Jackson. (4/20/21 Tr. at 65:19-22). "Out of whack" is a perfect definition of "an inchoate and unparticularized suspicion or hunch." *See Madsen*, 2021 WL 3932056, at *4. Hypothetically, "out of whack" might justify further investigation at a check point at the exit door of 207 Pennington—indeed, manning a checkpoint fits comfortably with the police conduct as described in their own words. But high crime neighborhood or Nate Love hangout or not, 207 Pennington Street is apartment housing and people live there, and the police presence that November morning was for the purpose of arresting someone other than Omar Jackson. Instead, police officers subjected Jackson to an investigative stop, showed him by their conduct that he was not free to leave, and searched the contents of the bag he was carrying[7] without the requisite

---

[7] Based on this analysis, whether the contents of the bag were in plain view is not relevant. Resendes' testimony that Jackson voluntarily exposed the contents fails to be credible for the same reason his testimony that Jackson was free to leave—the facts show that Jackson was in a coercive environment.

14

reasonable suspicion that he was carrying contraband. The government has failed to establish that the stop, seizure, and search were reasonable under *Terry*, *Rodriguez*, or any of the "totality of tests" available, and the Court finds the recovery of the gun was the product of an unconstitutional intrusion.

### IV.     Conclusion

The Court concludes that Jackson was subjected to a seizure and search that were unreasonable under the Fourth Amendment. Accordingly, his motion (D.E. 19, 64) to suppress evidence of the gun in his possession will be granted. An appropriate order will issue.


Dated: October 26, 2022                                  /s/ Katharine S. Hayden
                                                                                        Katharine S. Hayden, U.S.D.J.